## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— :

ZACHARY ALAN STARR, individually and :     CIVIL ACTION
derivatively on behalf of the VAN KAMPEN :
EQUITY AND INCOME FUND, the :
VAN KAMPEN EQUITY TRUST[1] :     Case No.  04-CIV-3386 (RO)
and the "VAN KAMPEN FUNDS", :
  :
        **Plaintiff** :
  :
        v. :
  :
VAN KAMPEN INVESTMENTS, INC., :
VAN KAMPEN ASSET MANAGEMENT, :
INC., MORGAN STANLEY DW INC., :
MORGAN STANLEY INVESTMENT :
ADVISORS, INC., MORGAN :
INVESTMENTS, LP, VAN KAMPEN :
FUNDS, INC., DAVID C. ARCH, J. MILES :
BRANAGAN, JERRY D. CHOATE, :
ROD DAMMEYER, LINDA HUTTON HEAGY,:
R. CRAIG KENNEDY, HOWARD J. KERR, :
HUGO F. SONNENSHEIN, JACK E. NELSON, :
SUZANNE H. WOOLSEY, :
MITCHELL C. MERIN, RICHARD F. :
POWERS and WAYNE W. WHALEN, :
  :
        **Defendants** :
  :
        **and** :
  :
the VAN KAMPEN EQUITY AND INCOME :
FUND, the VAN KAMPEN EQUITY TRUST :
and the VAN KAMPEN FUNDS, :
  :
        **Nominal Defendants** :
—————————————————————————— :

## FIRST AMENDED DERIVATIVE COMPLAINT

———————————————————

[1]      A list of the mutual funds comprising the Van Kampen Equity Income Fund and the Van Kampen Equity Trust (the "Trusts") is attached to this First Amended Derivative Complaint ("Complaint") as Exhibit A.

The Plaintiff, Zachary Alan Starr, derivatively on behalf of the Van Kampen Equity and Income Fund, the Van Kampen Equity Trust and the Van Kampen Funds hereby complains against the Defendants as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to Section 44 of the Investment Company Act of 1940 ("Investment Company Act"), 15 U.S.C. § 80a-43; Section 214 of the Investment Advisers Act of 1940, 15 U.S.C. §80b-14; and 28 U.S.C. § 1331.

2.      This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein, because they arise out of and are part of the same case or controversy as the federal claims alleged.

3.      Venue is proper in this judicial district because some or all of the Defendants conduct business in this district and some of the wrongful acts alleged herein took place or originated in this district.  Defendants Morgan Stanley DW, Inc. and Morgan Stanley Investment Advisors, Inc., two of the entities responsible for the operations of the Van Kampen Funds are headquartered in this district.

4.      In connection with the acts and practices alleged herein, Defendants directly or indirectly used the mails and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets and national securities exchanges.

## PARTIES

### Plaintiff

5.      Plaintiff Zachary Alan Starr ("Plaintiff"), a resident of East Quogue, Suffolk County, New York, owns shares of the Van Kampen Equity and Income Fund and shares of the Van Kampen Small Cap Value Fund which were purchased in the Fall of 2002 and continues to hold such shares.[2]

### Van Kampen Defendants

6.      *Defendant Van Kampen Investments, Inc.* ("Van Kampen Investments"), is a diversified asset management company advising the Van Kampen Funds.  Van Kampen Investments is a subsidiary of Morgan Stanley (*see* below) and is headquartered at 1 Parkview Plaza, P.O. Box 5555, Oakbrook Terrace, Illinois 60181.

7.      *Defendant Van Kampen Asset Management, Inc.* ("VKAM") at relevant times was registered as an investment adviser under the Investment Advisers Act ("IAA").  VKAM served as sole investment adviser to the Equity and Income Fund and investment adviser to certain of the Funds in Equity Trust.  VKAM is a wholly-owned subsidiary of Van Kampen Investments and an indirect subsidiary of Morgan Stanley.  As of March 31, 2003, VKAM had $66 Billion under management in 50 open-end funds, 30 closed-end funds and 2700 unit investment trusts. VKAM manages the Funds' assets, *including placing portfolio orders for* sale pursuant to Investment Advisory Agreements entered into with the Trusts.  VKAM is also headquartered at 1 Parkview Plaza, P.O. Box 5555, Oakbrook Terrace, Illinois.  VKAM receives fees calculated as a percentage of net assets under management in the Funds it advises

8.      *Defendant Van Kampen Funds, Inc.* ("Distributor") is the Distributor and primary underwriter for each of the Funds and for each Class of shares.  The Distributor is a wholly-

---

[2]      Plaintiffs verification was attached to the Complaint originally filed.

owned subsidiary of Van Kampen Investments and an indirect subsidiary of Morgan Stanley. The Distributor is an "affiliate" of the Adviser Defendants and each of them as that term is defined in the ICA.

9.    The defendants described in paragraphs 6 to 8 above are referred to together as the "**Van Kampen Defendants**."

**Morgan Stanley Defendants**

10.    *Defendant Morgan Stanley* ("Morgan Stanley") is the ultimate parent of all of the Defendants bearing the "Morgan Stanley" and "Van Kampen" names. Through its subsidiaries, Morgan Stanley is a full service securities firm that markets, sponsors, and provides investment advisory, distribution, and administrative services to mutual funds. Morgan Stanley is incorporated in Delaware and is located at 1585 Broadway, New York, New York 10036. Morgan Stanley was also the ultimate beneficiary of the compensation, profits and other benefits received from the illegal and manipulative scheme described in this Complaint.

11.    *Defendant Morgan Stanley DW, Inc. a/k/a Morgan Stanley Dean Witter* ("MSDW") is a registered broker-dealer, providing various investment services including retail brokerage services. MSDW is the direct employer of the brokers and financial advisors ("FAs") that sold the Van Kampen Funds to retail investors employing the manipulative acts and practices described in this Complaint. MSDW's principal office is located at 825 Third Avenue, New York, New York, but it has approximately 500 branch offices providing retail brokerage services nationwide. MSDW is a subsidiary of Morgan Stanley.

12.    *Defendant Morgan Stanley Investment Advisors, Inc.* ("MSIA"), a wholly owned subsidiary of Morgan Stanley, is a registered an investment advisor under the IAA. MSIA managed and advised the proprietary funds marketed and sponsored directly or indirectly by Morgan Stanley including certain of the Van Kampen Funds, which it advised pursuant to a

contract as a Sub-Adviser.  MSIA is headquartered at 1221 Avenue of the Americas, New York, New York 10020.  MSIA received fees calculated as a percentage of net assets under management for the Funds it advised making it a beneficiary of the compensation an scheme described in this Complaint.

13.    *Defendant Morgan Stanley Investments LP* ("Morgan Stanley LP")is registered as an investment adviser under the IAA,  and an indirect wholly owned subsidiary of Morgan Stanley.  Morgan Stanley LP managed and advised proprietary funds for Morgan Stanley including certain Van Kampen Funds as Sub-Adviser at relevant times to this Complaint. Morgan Stanley Investments LP is located at One Tower Bridge, West Conshohocken, Pennsylvania.

14.    The companies described in paragraphs 10-13 above are referred to together as the "**Morgan Stanley Defendants**".

15.    Van Kampen Investments, VKAM, Morgan Stanley, MSIA and Morgan Stanley LP are referred to together as the **"Adviser Defendants."**  The Advisors Defendants at relevant times were responsible for the day-to-day management of the Van Kampen Funds.

**<u>Trustee Defendants</u>**

16.    The defendants named below are each Trustees of the Van Kampen Equity Trust and the Van Kampen Equity and Income Fund (hereafter **"Trustees"** or **"Trustee Defendants"**).

(a)    David C. Arch (58)

(b)    J. Miles Branagan (71)

(c)    Jerry D. Choate (65)

(d)    Rod Dammeyer (62)

(e)    Linda Hutton Heagy, member of the Brokerage and Services Committee (55)

     (f)      R. Craig Kennedy (51)

     (g)      Howard J. Kerr (67)

     (h)      Jack E. Nelson, member of the Brokerage and Services Committee (67)

     (i)      Hugo F. Sonnenschein (62)

     (j)      Suzanne H. Woolsey, member of the Brokerage and Services Committee (61)

     (k)      Mitchell C. Merin[*] (50)

     (l)      Richard F. Powers[*] (57)

     (m)      Wayne W. Whalen, Esquire[*] (64)

17.    These Trustees serve as Trustees of all of the Van Kampen Funds and are responsible for governing the Funds, protecting the interests of Funds' and their shareholders, general oversight of each Funds' business, assuring that the Funds are managed in the best interest of shareholders, and assuring that all rules and regulations of state and federal governmental regulatory agencies, and self-regulating organizations are followed. The Trustees are "directors" within the meaning of the ICA, 15 U.S.C. § 80a-2(a)(12).

18.    The Trustees of the Van Kampen Funds serve indefinitely and are not subject to regular shareholder election or review. The Trustees are elected only at meetings held for that purpose, but the Funds hold meetings to elect Trustees only when *required to do so by the ICA*. The ICA, in turn requires such a meeting only when the number of Trustees elected by the shareholders falls below a majority, but in the interim periods allows Trustee vacancies to be

---

[*]    Asterisk indicates that a Trustee/Director is an "interested person" within the meaning of the ICA. Hereafter "Trustees" is used to mean Trustees or Directors, the only difference being in the corporate form. The number in parenthesis is the Trustee's age.

filled in any legal manner, so long as after filling the vacancy at least two thirds of the Trustees then holding office have been elected by a shareholder vote.

19.     As a result of this system, Van Kampen Fund shareholders are rarely given the opportunity to elect Trustees.  In fact, the shareholders have not actually elected Trustees since **1999.**  The next previous elections were held in 1997, 1995 and 1993.  Four out of the ten "outside" Trustees *were never elected by shareholders at all*.  Defendants Arch, Dammeyer, Kerr, and Sonnenschein were *appointed* as Trustees on July 23, 2003 by the other Trustees. Shareholders have not been given an opportunity to ratify or disapprove of their appointments.

20.     Trustees serve indefinitely.  Each Trustee holds office until the earlier of the following:  (i) his/her successor is elected and qualified; (ii) his/her death; (iii) his/her resignation; (iv) when he/she reaches seventy-three years of age; or (v) he/she is removed.

21.     Theoretically shareholders can call meetings to elect or remove Trustees but in order to call such a meeting shareholders holding at least 10% of the outstanding shares must request the meeting *AND the shareholders must pay in advance the estimated cost of preparing and mailing the notices of the meeting.*  Therefore, for all practical purposes the shareholders elect Trustees only when the Adviser Defendants decide to hold elections.

22.     The Trustees appoint the officers for each of the Funds, to the extent the Funds have officers.

23.     Non-Affiliated (non-interested) Trustees receive compensation from Funds in the form of an annual retainer, plus a meeting fee.  Trustees may elect a deferred compensation plan whereby annual compensation will be deferred until retirement, earning until such time a rate of return computed with reference to the rate of  return on the common shares of *any Fund in the open-end complex.*  In addition, Trustees receive a retirement benefit of $2500 per year for each year of service.

24.    The Board of Trustees has three standing committees:  the Audit Committee, Brokerage and Services and the Retirement.  *The Brokerage and Services Committee reviews the Funds' allocation of brokerage transactions and the Funds' soft-dollar practices.*

25.    The Trustees retained the Adviser Defendants to make the day-to-day investment decisions, advise and manage for the Trusts and sub-contract out services including those of the to Van Kampen Funds for distribution.

26.    The Van Kampen Defendants, MSIA, Morgan Stanley LP and the Trustee Defendants are referred to together as the **"Fiduciary Defendants."**

**<u>Nominal Defendants</u>**

27.    *Nominal Defendant, the Van Kampen Equity Trust*, is a Delaware Statutory Trust that is registered under the Investment Company act as a diversified management company acting pursuant to a Declaration of Trust dated May 10, 1995.

28.    *Nominal Defendant, the Van Kampen Equity and Income Fund*, is a Delaware Statutory Trust, is registered under the Investment Company Act and is an open-ended diversified management company acting pursuant to a Declaration of Trust dated June 21, 1995.

29.    The Adviser Defendants essentially "run" the Funds pursuant to the Investment Advisory Agreements entered into between the Trusts and VKAM dated May 31, 1997 and February 14, 1999.[3]  The Trustees, contract out advisory and all other non-advisory management services on the recommendation of the Adviser.  But the Trustees retain ultimate responsibility and are the only "independent" parties available to supervise the Funds.

30.    The Trusts contracted with affiliates of VKAM for the functions of a Sub-Adviser (MSIA) or Distributor.

---

[3]    Each of the contracts described in this Complaint can be found through the SEC EDGAR website at:  http://www.sec.gov/edgar/searchedgar/companysearch.html.

31.     The contract between the Van Kampen Equity Income Fund and the Distributor requires that the Distributor "in all respects" comply with state and federal laws and the Rules of the SEC and NASD.  *See* Distribution and Service Agreement between Van Kampen Equity Trust and the Distributor, dated February 4, 1999.

32.     The Distributor is paid by the Fund for out-of-pocket costs and expenses incurred in the distribution pursuant to a 12b-1 plan (*see* below).  The Distributor is also paid by the Fund for maintaining shareholder accounts.  *Id.*

33.     The Nominal Defendants are referred to together as the "**Trusts.**"

**Funds**

34.     *The Van Kampen Funds* are a family or complex of mutual funds that are legally each a series of one of the Trusts.  These series are commonly called Mutual Funds, but in fact each series or *Fund* is little more than an accounting entry of the Delaware Statutory Trust.  The Funds are all sold to retail investors under the Van Kampen name no matter by which Trust held. An investor is a beneficiary of the Trust.

35.     The purpose of the Funds is ostensibly to allow the smaller investor to diversify his/her investment portfolio and maximize value through the selection of assets through access to the expertise of the Adviser.  The Adviser for each of the Van Kampen Funds no matter by which Trust held is the same, directly or ultimately, since Sub-Advisers report to Advisers.  The Adviser is owned directly or indirectly by Morgan Stanley.  The same Trustees are manage the business affairs of all of the Funds.

36.     Each of the Funds is created and sponsored by the Adviser or its parent companies and is managed under the supervision of the Trustees.  The same Trustees supervised all the Funds at relevant times hereto, and their meetings for all the Funds occur at or about the same time.  Each of the Funds has the same Adviser (directly or indirectly), the same Distributor, all of

whom serve indefinite terms. The agreements between the Funds and each of these entities are identical form agreements, with only minor differences only in fee percentages. In many instances, the funds share costs among themselves. In substance, all the Funds in each Trust and in both Trusts are operated as a single *de facto* entity trading under a single commercial brand. Plaintiffs therefore bring this action as a derivative action on behalf of the entire Van Kampen family of Funds, as well as on behalf of the Trusts and the particular Fund in which he invested.

## PRELIMINARY STATEMENT

37.    This derivative action is brought to recover damages for injuries to the Trusts and the Funds and each of them caused by the Defendants' acts as described in this Complaint, all which were breaches of fiduciary duty and operated to harm the Plaintiff and the Nominal Defendants (hereafter together "Plaintiff").

38.    The Adviser Defendants and the Fiduciary Defendants breached their duties to the Funds in an effort to enrich themselves by increasing the assets under management and thus increase their fees and profits, employing a deceptive and manipulative scheme designed to sell more Fund shares in the short term (and thus increase fees), but ultimately damaging the Funds. The Trustee Defendants who were charged with the responsibility for overseeing of the Funds and enforcing the Funds' policies failed or refused to perform their duties by ignoring or recklessly disregarding the practices of the Adviser Defendants alleged in this Complaint.

39.    The practices alleged in the Complaint arise in part from the substantial and unresolved conflicts of interest between mutual funds and their advisers, as well as the parent companies, which create and manage these Funds. The nature and extent of these conflicts and the adverse impact it caused were known to the Trustee Defendants of the Funds who every year approve or ratify the Advisers' contract(s) and the Distributors' contracts without adequate disclosure of the nature of the fees charged or the sources of these fees or the means employed to

earn those fees. In each instance of wrongdoing alleged, because of the affiliations between and among the Van Kampen Defendants and the Morgan Stanley Defendants, the profits from the manipulative scheme described in this Complaint found their way to the same pocket -- Morgan Stanley.

40. Each of the Fiduciary Defendants owed to the Trusts and the Funds as well as their shareholders the fiduciary duties of loyalty, candor and fair dealing, and the duty of full and candid disclosure of all material facts.

41. Each of the Fiduciary Defendants owed to the Trusts and the Funds as well as their shareholders the fiduciary duty not to engage in deceptive contrivances or schemes, acts or transactions or courses of business that operate as a fraud or deception on the Van Kampen Funds and their shareholders.

42. Each of the Fiduciary Defendants owed to the Trusts and the Funds as well as their shareholders the duty to refrain from collecting excessive fees for compensation and other services and to preserve the Funds' property and assets, and the Trustee Defendants owed to the Trusts and the Funds the duty to be fully informed regarding that compensation.

43. Each of the Defendants owed to the Funds the duty not to place their own financial interests above those of the Funds and the shareholders.

44. The acts of the Defendants described in this Complaint were acts constituting willful misfeasance, bad faith, gross negligence and reckless disregard of the duties involved in the conduct of their office.

## FACTUAL ALLEGATIONS

45. This Complaint arises from a plan and scheme operated in connection with the offer and sale of the Van Kampen Funds to investors by MSDW, an affiliated broker-dealer to

the Adviser Defendants and Distributor for the Funds designed to benefit the Van Kampen Defendants and Morgan Stanley Defendants at the expense of the Funds..

46.    MSDW, as a retail brokerage house, is authorized to offer and sell shares of approximately 115 mutual fund complexes, for which it and its brokers (called "FA's" by MSDW) received compensation.  But MSDW and its FAs received additional compensation on the sale of the mutual funds from a select group of fund complexes to "push" the sale of those funds.  Ultimately 14 fund complexes, *including the Van Kampen Funds*, paid additional compensation through "co-operative" programs operated by MSDW.

47.    Beginning January 2000, MSDW operated two in-house mutual fund marketing programs.  MSDW collected amounts in excess of standard sales loads from preferred mutual fund complexes, *including from the Adviser Defendants or Distributor for Van Kampen Funds*, and in return MSDW recommended the Van Kampen Funds, to investors through its network of FA's.  The MSDW marketing programs enabled the Adviser and Distributor of Van Kampen Funds, with the knowledge and approval of the Adviser Defendants, to promote the sale of the Funds through MSDW's extensive retail distribution network via this scheme.  MSDW passed along some of this excess load paid to incentivize brokers and branch managers.  MSDW also monitored its FAs performance to assure volume in sales of preferred funds remained satisfactory.

48.    MSDW's marketing program was initially known as the "Asset Retention Program".  Later, it was renamed the "Partners Program."  The Van Kampen Funds through the Distributor participated in both programs.

### (1)    Asset Retention Program

49.    The Asset Retention Program begun in January 2000.  The Van Kampen Funds *"participated" in the Asset Retention Program* by paying MSDW:  (i) 15 or 20 basis points

("bps") on gross sales of open-end, variable-priced mutual fund shares (the "gross sales payments") and (ii) 5 bps on aged assets (participating fund shares held over one year), which the firm then paid to the brokers responsible for the accounts holding these assets.   These payments *were **in addition to*** existing payments such as commissions, 12b-1 fees, shareholder servicing fees and account maintenance fees.  The Distributor paid these extra fees for the Van Kampen Funds when such fees were paid in cash.  VKAM or the Sub-Adviser paid the fees if payments were made in "soft dollars."  (*See* below).

50.      MSDW requested payments in cash, *i.e,*. "hard dollars", but MSDW also accepted Asset Retention Program payment in the form of brokerage commissions on participants' portfolio trades (called "soft dollars").

51.      In return for payments, the Van Kampen Funds received a number of marketing benefits.  First, MSDW included the Van Kampen Funds on its "preferred list," which was a list of favored fund complexes that FAs were to look to *first* in making recommendations to retail customers on mutual fund products.  Second, MSDW physically increased the visibility of the Van Kampen Funds at its broker's work stations, *increased their shelf space*.

(**2**)      **Partners Program**

52.      On December 1, 2002, MSDW rolled out the new "Partners Program" replacing the Asset Retention Program.  The Partners Program was similar to the Asset Retention Program, but participants in the Partners Program, *i.e.*, like Van Kampen, received even greater access to MSDW's sales network and brokers.  *The Van Kampen Funds participated in the Partners' Program and the Distributor and Adviser Defendants paid even greater compensation incentives to MSDW for the sale of its Funds.*   Under the Partners program, for example, aged asset payments (fund shares held over a year) were always made in cash.

53.    MSDW calculated the payments owed to it by a Partners Program participant, based on the sales figures periodically turned in by the Adviser Defendants or Distributor and billed those amounts to the Adviser or Distributor. Here cash payments were made by the Distributor.  The Adviser Defendants, however, are responsible for placing trades. The Partners Program participants then either sent a check *or sent trades with sufficient brokerage commissions to satisfy the payment requirements*.  Most of the Funds that paid via brokerage commissions executed portfolio trades on MSDW's trading desk until January 2002 and, thereafter, on the trading desk of Morgan Stanley & Co., an affiliate of MSDW, which then earmarked a portion of the commission for payment to MSDW.

54.    The Asset Retention Program Participants and Partners Program participants that paid via brokerage commissions were required to pay commissions, as a negotiated multiple of the amount that would have paid in hard dollars.  The trading desk retained one-third of the commission to cover its expenses, *while the remaining two-thirds was directed to MSDW*.  Thus, for a program participant that agreed to pay 15 bps on gross sales via brokerage commissions with a multiplier of 1.5, generated a revenue stream of 22.5 bps on gross sales with one-third, or 7.5 bps, being retained by the trading desk, and 15 bps directed to MSDW.

55.    VKAM and the Adviser Defendants regularly put securities with broker dealers, including MSDW to effect transactions for the Funds and negotiated brokerage commissions for these transactions.  The placement of the Funds' portfolio business and the policies and practices for placing that business was a duty of VKAM Sub-Adviser and regularly reviewed by the Trustees.  The Brokerage and Services Committee of the Board of Trustees of the Funds was specifically charged with overseeing the Advisers' arrangements with all brokers, including MSDW.

56.     The Distributor also benefited from the illegal scheme by receiving increased fees based on the money deposited into the mutual funds.  Distributors often receive fees based on assets under management and may earn additional commissions on sales of fund shares.  The latter fees, known as "12b-1 Fees," are paid pursuant to a plan adopted by mutual funds under Rule 12b-1 promulgated by the SEC under the ICA for marketing and distributing mutual fund shares.  Rule 12b-1 permits a mutual fund to pay distribution-related costs out of fund assets, provided that the fund adopts "a written plan describing all material aspects of the proposed financing of distribution," which must include an express finding that the fees paid will result in a net economic benefit to the funds.  17 C.F.R. ¶ 240.12b-1.  (*See* below).

### (3)     Stated Van Kampen Fund Policies

57.     VKAM stated, in a typical Fund Statement of Additional Information ("SAI"), that its "primary" consideration in placing orders is *prompt execution at the most favorable price*, but that the Adviser "can pay higher commissions" to brokerage firms that provide research to the Adviser.  This research, however, *merely supplemented* the Adviser's work because the Adviser Defendants are already compensated for research performed.

58.     The Trustees are responsible for reviewing the benefits to the Adviser of third party research *paid for by Fund assets* whether directly or indirectly and the propriety of such arrangements.

59.     The Prospectuses for the Van Kampen Funds throughout the time that the Funds (through the Adviser Defendants and the Distributor) participated in the Asset Retention Program and Partners' Program disclosed the existence of soft dollar programs, but stressed that the primary goal in selecting brokers was *best execution*, always under the umbrella concept of the good of the Fund.  Because brokerage commissions can be an enormous annual expense, up to almost $2 million for just one fund or series of the Trust, paying "soft dollars" to push Fund

sales which generates fees, rather than negotiating a lower commission and preserving assets is not in the best interests of the Funds, and particularly so when that extra money paid is removed from the Funds assets and ultimately paid to affiliates of the Adviser Defendants.

### (4)    Failure to Supervise

60.    In the face of its stated policy, the duty of best execution and the Fiduciary Defendants' fiduciary duties to the Funds and the shareholders, the Fiduciary Defendants knowingly, deceptively permitted and actively facilitated or were reckless in not preventing the Distributor and Adviser Defendants in entering into relationships with MSDW to allow MSDW to collect excess fees and to transact portfolio business in such a manner as to benefit the Adviser Defendants and Morgan Stanley at the expense of the Funds through the Asset Retention Program and the Partners' Program.

61.    The Adviser Defendants failed to supervise the Distributor for the Van Kampen Funds and failed to prevent the Distributor from entering into and participating in the Asset Retention Program and Partners Program with MSDW.

62.    The Trustee Defendants failed to supervise the Adviser Defendants and the Distributor and failed to prevent them from entering into and participating in the Asset Retention Program and Partners Program with MSDW.

### (5)    12b-1 Plans

63.    Almost all of the Van Kampen Funds have adopted distribution and service plans pursuant to Rule 12b-1 under the ICA ("12b-1 Plans").  One requirement under Rule 12b-1 is that the independent directors, here Trustees, of the fund decide, in their reasonable business judgment, that there is a reasonable likelihood that the imposition of 12b-1 fees will benefit the fund and its shareholders.  17 C.F.R. § 270l.12b-1(e).  A primary motivation for Rule 12b-1 was to permit mutual funds to use their assets to stem net redemptions, which hurt the funds by

increasing expense ratios and hampering portfolio managers from effectively managing assets. Under the 12b-1 Plans adopted by the Van Kampen Funds, Rule 12b-1 fees are periodically deducted from the assets of the Funds to compensate for distribution expenses. These fees *are paid to the Distributor*, who retains a portion of the fee and shares a portion with broker-dealers who sell or sold Fund shares to investors. The 12b-1 Fees are calculated as a percentage of average daily net assets in the Van Kampen Funds and are accrued daily. The Distributor passes along the 12b-1 fees to third party brokers who sell the Funds. The payments made to MSDW under the Asset Retention Program and Partners Program were in addition to any commissions or portions of 12b-1 fees received on behalf of the Van Kampen Funds.

### (6)     Damages

64.     As a result of Defendants' misconduct, the Van Kampen Funds are exposed to significant regulatory scrutiny and to suit by investors for losses, at a minimum causing the Van Kampen Funds to incur unnecessary direct and internal investigatory, litigation and administrative costs and potentially resulting in awards, judgments and settlements against the Van Kampen Funds.

65.     As a result of the events described in this Complaint, the proprietary Morgan Stanley Mutual Funds including the Van Kampen Funds suffered an outflow of $1.5 Billion in assets by January 2004 causing the Van Kampen Funds NAV to decline and the market value of the Funds to decline.

### (7)     Regulatory Actions

66.     In August 2003, the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth filed an administrative complaint against MSDW arising from MSDWs Asset Retention Program and the Partners Program.

67.    In September 2003, the NASD announced that it had fined and censured Morgan Stanley for its improper practices in connection with the Asset Retention Program and the Partners Program.

68.    In November 2003, the SEC announced a simultaneous institution and an enforcement action against MSDW for its improper practices in connection with the Asset Retention Program and the Partners Program.  The settlement required a payment by MSDW of $50 million.

## DEMAND EXCUSED ALLEGATIONS

69.    The Plaintiff has not made demand upon the Trustees of the Van Kampen Funds to bring an action against Morgan Stanley, or the Adviser Defendants, the Distributor or other culpable parties to remedy such wrongdoing.

(a)    Demand is excused because no such demand is required for the Plaintiff to assert a federal claim under Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in connection with the compensation and other payments paid to the funds' adviser. Plaintiffs have not made a demand upon the Trustees of the Funds to bring action against the Adviser, the Distributor, or any other culpable parties because doing so is excused or would be futile for the reasons set forth below.

(b)    No demand is required with respect to Plaintiffs claims under Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in connection with compensation and other payments of a material nature to the Adviser Defendants or their affiliates.

(c)    The Trustees are put into office by the Adviser Defendants, and are not required to stand for election or reelection by shareholders of the Funds except on rare occasions, and thus are not accountable to the shareholders of the Funds.  Rather, the Trustees effectively

serve at the pleasure of the Adviser Defendants.  Additionally, the Trustees serve on the boards of all the Funds of the Van Kampen Funds, and are paid for this service with substantial fees and lucrative retirement benefits, in magnitudes that are sufficient to influence them to act in the interest of the Adviser Defendants when the interests of the Adviser Defendants may conflict with the interests of the Funds.

(d)    Demand is also excused because the unlawful acts and practices alleged in this Complaint are not subject to the protection of any business judgment rule and could not be ratified, approved, or condoned by disinterested and informed directors under any circumstances.

(e)    Demand is also excused because the unlawful acts and practices alleged herein involve self-dealing on the part of the Adviser Defendants and Distributor who manage and control the day-to-day affairs of the Funds and the Trust.

(f)    Demand is also excused because the Trustee Defendants have known since at least January 2000 about the activity described in this Complaint and did nothing to stop it and nothing to discipline the managers involved and in fact formed a committee of the Board of Trustees to *supervise*, but not eliminate the practice.

(g)    Demand is also excused because the Adviser Defendants and the Trustee Defendants have known since at least January 2000 about the unlawful activity alleged in this Complaint and have done nothing to recover the damages.

70.    Under Section 15(c) of the ICA, 15 U.S.C. § 15(c), the Trustees have and had an express duty "to request and evaluate … such information as may reasonably be necessary to evaluate the terms" of any investment advisory contract with respect to the Fund.  In this case, the Directors or Trustees have and had a duty to obtain all information regarding all arrangements of the Adviser *and its related Affiliates*, including all terms and conditions applicable to contracts with the Distributor.  Any terms, conditions, or arrangements whereby the

Adviser Defendants facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, the illegal acts alleged herein were, in fact, part of the Adviser's contract.

71.    Alternatively, any such arrangements are and were, at minimum, among the information "reasonably necessary to evaluate the terms of" the Investment Advisory Agreement or Contract, within the meaning of Section 15(c) of the Investment Company Act. Consequently, the Trustee Defendants either failed to request all of the "reasonably necessary" information they needed to evaluate the Investment Advisory Contract or the contracts of its Affiliates.

72.    The Trustees Defendants duties required them independently to act without a demand from a shareholder under the circumstance of this action.  Their duties did not and do not come into play only when "kick-started" by a shareholder demand.  The Trustee Defendants' fiduciary duties apply and applied at all times to require them to act in the best interest of the Funds, to protect the Funds from harm, and to recover damages for the Funds when the Funds have been harmed.

73.    Given the Trustee Defendants awareness of the foregoing facts, and their demonstrated failure to act in the face of their knowledge of those facts, there is, at minimum, a reasonable doubt as to whether they would be independent and disinterested in responding to a demand.  Moreover, given the egregiousness of the Trustees' failure of oversight as outlined above, there is, at minimum, a substantial likelihood that they will be subject to personal liability for inadequate oversight of the officers and employees of the Funds. This exposure to a substantial likelihood of personal liability prevents the Trustees from being able to consider a demand impartially, if one had been made.

## COUNT I

## VIOLATIONS OF SECTIONS 36(b) OF THE  INVESTMENT COMPANY ACT
### (Against the Adviser Defendants and Distributor)

74.    Plaintiff incorporates by reference all paragraphs above except paragraphs relating to demand.

75.    The Trusts and each of them are registered investment companies under the ICA.

76.    The Adviser Defendants are investment advisers to the Trusts and Funds under Section 2 of the ICA.

77.    The Distributor is an "affiliate" of the Adviser Defendants and each of them as that term is defined in Section 2(a)(3) of the ICA.

78.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser of a mutual fund owes to the mutual fund the fiduciary duties of loyalty, candor, and due care with respect to the receipt of compensation for services or payments of a material nature paid by the mutual fund to such investment adviser or any affiliated person. Those fiduciary duties apply not only to the terms of the advisory fee agreements, but also to the manner in which advisers seek approval of such agreements.

79.    Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the Adviser Defendants owe and owed to the Funds the fiduciary duties of loyalty, candor, and due care with respect to the receipt of compensation for services or payments of any material nature paid by the Funds or its shareholders to the Adviser Defendants or any affiliated person.  Those fiduciary duties include, but are not limited to, the duty of the Adviser to seek approval of any advisory agreement upon full disclosure of all information material to the Trustees' decision regarding the Adviser's compensation.

80.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund

"such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

81.    Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the Adviser Defendants from soliciting the approval of any advisory agreement from the Funds or the Trustees by use of false or misleading information, or by failing to disclose information material to the Trustees Defendants' decision regarding the Adviser's compensation. Information concerning conflicts of interest, the nature and extent of the conflicts, the nature and the Adviser's permission, facilitation, or encouragement of and participation in, or failure to detect and agreements to such as those described in the Complaint are particularly important to the Funds and to their independent trustees.

82.    After a reasonable opportunity to conduct discovery, Plaintiff believes the evidence will show that, for any of the Funds, the Adviser Defendants and their affiliates did not make full and fair disclosure of all information that would be material to the Trustees' decision regarding fees and/or other compensation under advisory and/or other agreements, including in particular the Adviser Defendants' and Distributor's permission, facilitation, or encouragement of and participation in, or failure to detect and prevent, the Asset Retention Program and Partners Program described in this Complaint.

83.    Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the trustees of a mutual fund owe to the mutual fund an independent duty to "request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

84.     After a reasonable opportunity to conduct discovery, Plaintiff believes the evidence will show that, for any of the Funds, the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements, including in particular the Adviser Defendants' or Distributor's facilitation, permission, or encouragement of and participation in, or failure to detect and prevent, their participation in the illegal activities described in this Complaint.

85.     Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholders may bring a civil action against an investment adviser *or any affiliated person* who has breached his or its fiduciary duty concerning such compensation or other payments.

86.     Each of the Adviser Defendants and the Distributor, as their affiliates, breached his, her, its fiduciary duty to the Funds by the acts alleged in this Complaint including, without limitation, facilitating, permitting, or encouraging, participating in, or failing to detect and prevent, the acts alleged in this Complaint which were designed to increase deposits on the short tem on which they would and did receive fees and other compensation.

87.     By agreeing and/or conspiring with each other to facilitate, permit, or encourage, participate in, or by failing to detect and prevent, the illegal acts alleged in this Complaint, Adviser Defendants and the Distributor placed their own self-interest in maximizing their compensation and other payments over the interests of the Funds.

88.     As alleged herein, the Adviser Defendants and the Distributor breached their fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Funds or their shareholders.

89.     By virtue of the foregoing, the Adviser Defendants and the Distributor have violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

90.    As a direct and proximate result of the wrongdoing of the Adviser Defendants and the Distributor as alleged in this Complaint, the Van Kampen Funds have been reduced and diminished in value and the net value (NAV) of the Van Kampen Funds, the Trusts and each of the Funds have been wasted.

## COUNT II

### VIOLATIONS OF SECTION 47 OF THE INVESTMENT COMPANY ACT
### (Against the Adviser Defendants and the Distributor)

91.    Plaintiff incorporates by reference all paragraphs above except those relating to demand.

92.    Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), any contract made in violation of, or the performance of which results in a violation, of the ICA is declared unenforceable.

93.    For the reasons alleged herein, the agreements between the Adviser Defendants, and the Trusts and the Distributor and the Trusts, including the 12b-1 Plans, were made in violation of, and their performance resulted in violations of, the ICA and are, therefore, unenforceable.

94.    Under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), these agreements and the 12b-1 Plans may be voided and the Adviser Defendants and the Distributor are liable to return to the Funds all of the fees and consideration of any kind paid to them thereunder.

## COUNT III

### CONTROL PERSON LIABILITY UNDER SECTION 48 OF
### THE INVESTMENT COMPANY ACT
### (Against The Adviser Defendants, The Distributor Defendant,
### Morgan Stanley And The Trustees)

95.    Plaintiff incorporates by reference paragraphs all of the above paragraphs above except those relating to demand.

96.    Section 48 of the ICA, 15 U.S.C. § 47(a), provides that it is unlawful for any person, directly or indirectly, to cause another person to do any act or thing that violates the ICA.

97.    The Control Person Defendants[4] directly or indirectly, caused the Adviser Defendants and the Distributor to engage in the unlawful conduct alleged in this Complaint.

98.    Pursuant to Section 48 of the ICA, 15 U.S.C. § 47(a), the Control Person Defendants are liable for causing, directly or indirectly, the Adviser Defendants and the Distributor to engage in the unlawful conduct alleged herein.

99.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, all of which reduced the assets and value (including the NAV) of the Funds, for which send defendants are liable.

**COUNT IV**

**VIOLATION OF SECTION 206 OF THE
INVESTMENT ADVISERS ACT OF 1940
(Against Adviser Defendants and Distributor)**

100.    Plaintiff incorporates by reference all paragraphs above.

101.    The Adviser Defendants and the Distributor Defendant are investment advisers within the meaning of the IAA.

102.    The Trusts, and Funds are clients of the Adviser Defendants and the Distributor within the meaning of Section 206 of the IAA.

103.    Section 206 of the IAA, 15 U.S.C. § 80b-6, prohibits investment advisers from, among other things, directly or indirectly using the mails or any means or instrumentality of interstate commerce to (a) employ any device, scheme, or artifice to defraud a client or prospective client; (b) engage in any transaction, practice, or course of business which operates

as a fraud or deceit upon a client; and (c) engage in any act, practice, or course of conduct which is fraudulent, deceptive, or manipulative.

104.    The Adviser Defendants and the Distributor have violated Section 206 of the IAA by acting as alleged herein.  In particular, after a reasonable opportunity to conduct discovery, Plaintiff believes the evidence will show that the Adviser Defendants and the Distributor facilitated, encouraged, permitted, and participated in, or failed to detect and prevent, the participation in the manipulative schemes alleged in this Complaint, entered into their own personal gain at the expense of the Funds, and did not make full and fair disclosure of all information that would be material to a Trustee's decision regarding advisory and/or other compensation under advisory and/or other agreements, including in particular their facilitation, permission or encouragement of and participation in, or failure to detect and prevent, participation in the Asset Retention Program and Partners Program.

105.    Pursuant to Section 215 of the IAA, 15 U.S.C. § 80b-15, any investment advisory agreement made or approved in violation of any provision of the IAA, including the investment advisory agreements between the Adviser or the Distributor Defendants and the Funds or the Trustees and the 12b-1 Plans, is null and void and may not be enforced by any party thereto.

106.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, which reduced the assets and value (including the NAV) of the Funds, for which Defendants are liable.

---

[4]    The Control Person Defendants are defined as Morgan Stanley, the Advisor Defendants the Distributor and the Trustees.

## COUNT V

### COMMON LAW BREACH OF FIDUCIARY DUTY
### (Against the Fiduciary Defendants)

107.    Plaintiffs incorporate by reference all of the paragraphs above.

108.    The Fiduciary Defendants, and each of them, owe and owed to the Trusts and the Funds the fiduciary duties of loyalty, candor, and due care in the management and administration of the affairs of each of the Funds and in the use and preservation of the Trusts and the Funds' property and assets.  Further, the Fiduciary Defendants owed a duty to each of the Funds not to waste the Funds' assets and not to place their own personal self-interest above the best interest of the Funds.

109.    To discharge those duties, the Fiduciary Defendants and each of them were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Funds.

110.    As alleged in this Complaint, each of the Fiduciary Defendants breached his, her, or its fiduciary duties by approving or receiving unlawful or excessive compensation or payments in connection with Asset Retention Program and Partners Program and other manipulative arrangements and devices as alleged in this Complaint.

111.    As alleged above, each of the Fiduciary Defendants also breached his, her, or its fiduciary duties to preserve and not to waste the assets of the Funds and each of them by permitting or incurring excess charges and expenses to the Funds in connection with the illegal activity described in this Complaint.

112.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements and the 12b-1 Plans, all of which reduced the assets and value (including the NAV) of the Funds, for which defendants are liable.

113.    Each of the Fiduciary Defendants is jointly and severally liable to the Funds and the shareholders for the losses, damages and harms proximately caused by these breaches of fiduciary duty.

## COUNT VI

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Morgan Stanley Defendants)

114.    Plaintiff repeats and realleges all paragraphs above.

115.    The Morgan Stanley Defendants and each of them knew of the existence of the fiduciary duty between the Van Kampen Defendants, the Trustees and each of them on the one hand and the Van Kampen Funds on the other hand and knew the extent of that duty.  The Morgan Stanley Defendants knew of the acts described in this Complaint and knew that these acts were a breach of the fiduciary duties the Trustees and the Van Kampen Defendants owed to the Funds.

116.    The Morgan Stanley Defendants and each of them allowed for the use of their instrumentalities for the unlawful purposes described in this Complaint.  The Morgan Stanley Defendants and the Distributor maliciously, without justification and through unlawful means aided and abetted the Van Kampen Defendants and the Trustees in breaching their fiduciary duties and provided substantial assistance and encouragement to the Adviser Defendants in violating their fiduciary duties in the manner and by the actions described in this Complaint.

117.    As a direct and proximate result of their unlawful conduct, the Plaintiff has suffered damages for which the Morgan Stanley Defendants are liable.

## COUNT VII

### BREACH OF CONTRACT
### (Against the Adviser Defendants and the Distributor)

118.    Plaintiff repeats and realleges all paragraphs above.

119.    The Trusts and the Adviser Defendants and each of them entered into Investment Advisory Agreements which are renewed annually.

120.    The Trusts and the Distributor entered into a Distribution Agreement and 12b-1 Plan which are renewed annually.

121.    The Trusts have fully performed their obligations under the Investment Advisory Agreement and the Distribution Agreement.

122.    The Investment Advisory Agreements required and require the Adviser Defendants and Sub-Advisers to adhere to the Funds' policies and prospectuses and to the Rules and Regulations of the NASD and the SEC..

123.    The Adviser Defendants breached the Investment Advisory Agreements by the wrongful acts alleged in this Complaint.

124.    The Distribution Contract required and requires the Distributor to adhere to the Funds' policies and the prospectuses and the Rules and Regulations of the NASD and SEC.

125.    The Distributor breached the Distribution Contract by the wrongful acts alleged in this Complaint.

126.    As a direct and proximate result of the wrongful conduct described in this Complaint, the assets and value (including the NAV) of the Funds has been reduced and diminished and the corporate assets of the Funds have been wasted.

## COUNT VIII

### COMMON LAW INTERFERENCE WITH CONTRACT
### (Against the Morgan Stanley Defendants)

127.    Plaintiff repeats and realleges all paragraphs above.

128.    The Trusts and the Adviser Defendants and the Trusts and the Distributor are parties to contracts identified in this Complaint.

129.    The Adviser Defendants and the Distributor breached those contracts in the manner and by the actions described in this Complaint.

130.    The Morgan Stanley Defendants knew of the existence of the contracts described in this Count and knew their terms.

131.    The Morgan Stanley Defendants knowingly and intentionally induced the Adviser Defendants and the Distributor to breach these contracts and interfered with the Adviser Defendants and Distributor present and future performance of the contracts by the acts of wrongdoing described in this Complaint, intending to and proximately causing the described breaches of contract.

132.    The Morgan Stanley Defendants acted without justification or privilege and with the knowledge that their conduct would cause breaches of the contracts and did cause breaches of the contract.

133.    As a direct and proximate result of the Morgan Stanley Defendants' illegal conduct they are jointly and severally liable to the Funds with the Adviser Defendants and the Distributor for the injuries and damages suffered and which they will continue to suffer.

<u>COUNT IX</u>

**CIVIL CONSPIRACY**
**(Against All Defendants)**

134.    Plaintiff repeats and reallege all paragraphs above.

135.    The Defendants and various combinations of them entered into an agreement or agreements or combinations between and among each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of such agreements and combinations.    The Defendants by their actions have manifested actual knowledge that a tortious or illegal act or acts was planned and their intention to aid in such act or acts.

136.    The Defendants maliciously and intentionally conspired, combined and agreed between and among one another to commit one or more of the unlawful acts alleged in this Complaint or to commit acts by unlawful means causing injury to Plaintiff, the Trusts and the Van Kampen Funds and proximately causing injury and damages to the Plaintiff, the Trusts and the Van Kampen Funds for which they are jointly and severally liable.

137.    The Van Kampen Funds have suffered damages as a result of the wrongs and the conspiracy to commit such wrongs as alleged in the Complaint in an amount to be proved at trial.

**WHEREFORE**, plaintiff prays for judgment as follows:

A.    Removing the current Trustees of the Van Kampen Funds and replacing them with  independent Trustees selected and elected with Court supervision,

B.    Rescinding the management contracts 12b-1 Plans and Distribution Contracts for the Van Kampen Funds and replacing the manager,

C.    Ordering Defendants to disgorge all profits earned on the unlawful conduct alleged in the Complaint and all other relevant fees earned during the period of such conduct,

D.    Awarding monetary damages against all of the Defendants, jointly and severally, in favor of the Van Kampen Funds, for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, including punitive damages where appropriate, together with interest thereon,

E.    Awarding plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiff's attorneys, and experts,

F.    Granting plaintiff such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  October 8, 2004

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP

By: _____/s/_____
Daniel W. Krasner
Mark C. Rifkin
Demet Basar
Robert Abrams
270 Madison Avenue
New York, NY  10016
(212) 545-4600

CHIMICLES & TIKELLIS, LLP
Nicholas E. Chimicles
Michael D. Gottsch
Denise Davis Schwartzman
Timothy N. Mathews
100 Haverford Centre
Haverford, PA  19085
(610) 642-8500